<u>**NOT FOR PUBLICATION**</u>                              (Doc. Nos. 40, 44, 50)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____
                                          :
CRAIG BRENNER,                            :
                                          :
                    Plaintiff,            :     Civil No. 09-219 (RBK/KMW)
                                          :
          v.                              :     **OPINION**
                                          :
TOWNSHIP OF MOORESTOWN, et al.,           :
                                          :
                    Defendants.           :
_____          :

**KUGLER**, United States District Judge:

       This matter arises out of an alleged verbal altercation between citizens of the Township of Moorestown, New Jersey ("Moorestown") that eventually led to a physical confrontation between a citizen and police officers. Presently before the Court is the motion for summary Judgment filed by Defendants Township of Moorestown, Chief of Police Harry Johnson, Lieutenant Howard Mann, Sr., Officer Howard Mann, Jr., Officer Daniel Pascal, and Officer Michael W. Maahs (collectively "the Moorestown Defendants"), (Doc. No. 50), and the motions for summary judgment filed by Defendants Thomas Smith and Gerard Korrot, (Doc. Nos. 40, 44). For the reasons discussed below, the motion for summary judgment filed by the Moorestown Defendants is **GRANTED** in part and **DENIED** in part, and the motions for summary judgment filed by Defendants Smith and Korrot are **GRANTED**.

## I.      BACKGROUND[1]

Craig Brenner, John Parkin, Thomas Smith, and Gerald Korrot share a long, tortured history of disagreements.  Those disagreements result from their inability to resolve even the most seemingly inconsequential disputes.  Despite undergoing mediation and other forms of alternative dispute resolution, these gentlemen seem incapable of resolving their differences in an amicable manner.  This case is about the latest episode in their ongoing saga.

Craig Brenner relocated to Moorestown in December 2002.  Since that time, Brenner made a series of complaints to the Moorestown police regarding the conduct of his neighbors.  The Moorestown police responded to at least ten of Brenner's complaints over the course of approximately twenty-three months. [2]  Brenner's complaints cover a wide range of alleged conduct by his neighbors.  For example, Brenner complained that one or more of his neighbors: (1) banged a shovel on the ground near his driveway; (2) dumped leaves on his driveway; (3) stood on a ladder to observe his driveway; and (4) emitted noxious fumes in the vicinity of his home.  (Id.).  Brenner experienced particular difficulties with Korrot.  On one occasion, Brenner complained that Korrot erected a large sign on his house which stated that Brenner was a fraud. (Pl.'s Mem. in Opp'n to Moorestown Defs.' Mot. for Summ. J. Ex. H, at 33).  Korrot claims that he posted the sign because Brenner "created a police incident" at Korrot's workplace and threatened to ruin Korrot's life after Korrot cut Brenner from a little league football team when

---

[1] Prior to submitting documentation to this Court in the future, the parties should take heed of the New Jersey Federal Practice Rules.  Local Civil Rule 7.2(b), provides that "[a]ny brief shall include a table of contents and a table of authorities and shall not exceed 40 ordinary typed or printed pages . . . .  Briefs of greater length will only be accepted if special permission of the Judge or Magistrate Judge is obtained prior to submission of the brief."  Here, Plaintiff submitted a fifty-page brief without permission by this Court, and failed to include a table of contents in his brief.  Defendants submitted a forty-three page brief in support of their motion for summary judgment.

[2] Plaintiff complained to the Moorestown police on December 12, 2003; February 23, 2004; April 4, 2004; twice on February 3, 2005; May 18, 2005; May 29, 2005; October 18, 2005; October 20, 2005; and November 21, 2005, and the Moorestown police responded to each of those complaints.  (Pl.'s Br. Ex. L, Nos. 9-14, 31-34, 41-42, 45-46, 49-52, 54-55).

Brenner was an adolescent.  (Korrot Dep. 30:1-33:25, May 6, 2010).  Despite Brenner's

numerous complaints about his neighbors, Brenner only cites one occasion where one of his

neighbors reported his conduct to the Moorestown police department.  (Moorestown Defs.' Br. in

Supp. of Mot. for Summ J. Ex. L, Nos. 55-56(2)).

### A.  Defendants' Version of January 16, 2007

On January 16, 2007, Parkin and several contractors gathered at the base of his driveway

to discuss a construction project.  The vehicles in Parkin's driveway blocked Brenner's access to

his own driveway.  When Brenner returned home, he experienced difficulty parking in his

driveway.  After parking his vehicle, Brenner became visibly irate and approached Parkin's

porch with raised fists, screaming incoherently.  (Parkin Dep. 19:1-2, May 6, 2010; Korrot Dep.

9:12-15, 10:1-9, May 6, 2010).  After the brief tirade, Brenner left Parkin's porch.  At some point

after Brenner left Parkin's porch, Smith arrived to speak with Parkin.  After Smith and Parkin

concluded their conversation, Smith attempted to depart from Parkin's driveway in his vehicle.

However, Smith claims that he could not depart from Parkin's house because Brenner blocked

the exit with his vehicle.  Apparently, as Smith attempted to leave, Brenner maneuvered his

vehicle four or five times to block Smith's exit.  (Parkin Dep. 20:10-15, May 6, 2010; Smith

Dep. 89:5-25, Apr. 6, 2010).  Eventually, Smith successfully maneuvered out of Parkin's

driveway.  Smith also claims that at some point Brenner kicked his vehicle.  (Smith Dep. 92:2-8,

Apr. 6, 2010).

As a result of Brenner's conduct, Smith and Parkin called the Moorestown police

department.  However, due to an unrelated incident in Moorestown, the police department did

not respond immediately.

At approximately 6:05 p.m., Officer Mann, Jr. arrived at Villa Avenue.  Upon his arrival,

Officer Mann, Jr. approached Brenner and attempted to speak with him about the disturbance. Officer Mann, Jr. claims that as he attempted to get Brenner's attention, Brenner responded, "I didn't do anything" and continued walking. (Mann, Jr. Dep. 29:7-23, Apr. 13, 2010). Because Brenner ignored his initial commands, Officer Mann, Jr. drove his car in reverse alongside Brenner and continued asking him to stop walking. However, Brenner continued to ignore Officer Mann, Jr. and proceeded towards his driveway. At some point, Officer Pascal arrived on the scene. Officer Pascal claims that Brenner told the officers to "get off his f-ing lawn/property," claiming that he "didn't do anything f-ing wrong." (Pascal Dep. 66:20-25; 67:1-5, Mar. 22, 2010). When the officers told Brenner to stop screaming and to lower his voice, Brenner refused to obey their commands. (Pascal Dep. 67:7-10).

Eventually, Officer Mann, Jr. escorted Brenner to the front of the patrol car. However, as the officers led Brenner to the patrol car, Brenner became irate, and began yelling profanities at the officers and residents who gathered in the street to observe the debacle. (Mann, Jr. Dep, 44:7-16, Apr. 13, 2010). The officers informed Brenner that he was under arrest for disorderly conduct, and attempted to handcuff him. Brenner resisted by locking his hands in front of his body. Officer Pascal eventually employed a maneuver known as the "wrist lock" in order to place the handcuffs on Brenner's wrists. After the officers placed the handcuff on Brenner's left wrist, Brenner continued to resist. As a result, Officer Pascal applied the peroneal strike,[3] and the "straight arm bar takedown."[4]

Eventually, the officers successfully took Brenner to the ground. While on the ground, Brenner continued to resist by maneuvering his right hand into his waistband. According to the

---

[3] The "peroneal strike" is "a knee strike to the common peroneal, the thigh area between the subject knee and hip." (Pascal Dep. 88:13-15, Mar. 22, 2010).

[4] The straight arm bar takedown "is a trained maneuver whereby an officer takes his arm around the suspect's biceps area and take[s] the subject to the ground." (Pascal Dep., 90:11-16, Mar. 22, 2010).

officers, by maneuvering his hand into his waistband, Brenner created the additional risk that he

was reaching for a weapon.  After struggling with Brenner, Officer Mann, Jr. removed Brenner's

right hand from his waistband and applied the handcuffs.  The officers then searched Brenner for

weapons and took him to the police station.  At the police station, Brenner told Officer Pascal

that he could not walk and that he believed that the officers broke his leg.  Brenner did not

complain of any pain in his torso.  (Pascal Dep. 95:21-25, Mar. 22, 2010).  Approximately

twenty minutes after he arrived at the police station, the Moorestown Police escorted Brenner to

the Kennedy Memorial Hospital for minor abrasions on his face.  (Brenner Dep. 31:12-14, Mar.

9, 2010).  After Brenner was examined at the hospital, he was released back into police custody

and processed for disorderly conduct, N.J. Stat. Ann. § 2C:33-2(a)(2), intimidation, N.J. Stat.

Ann. § 2C:33-4(a), resisting arrest, N.J. Stat. Ann. § 2C:29-2(a)(1), obstructing the

administration of law, N.J. Stat. Ann. § 2C:29-1(a), and harassment, N.J. Stat. Ann. § 2C:33-

4(c).

Sometime during the scuffle, Officer Maahs arrived on the scene of the arrest.  Officer

Maahs observed Officers Mann, Jr. and Pascal attempting to take Plaintiff to the ground.

However, there is no evidence that Officer Maahs made any physical contact with Brenner

during his arrest.

### B.  Brenner's Version of the Events on January 16, 2007

Brenner offers a vastly different account of the events that transpired on January 16,

2007.  According to Brenner, he returned home from work and found several contractor vehicles

obstructing the path into his driveway.  (Brenner Dep. 167:2-12, Mar. 2, 2010).  When he urged

the truck drivers to move, one driver did not respond and the other moved his vehicle two or

three feet.  (Brenner Dep. 174:7 – 177:8, Mar. 2, 2010).  After the second driver moved his

vehicle Brenner backed into his driveway. (Brenner Dep. 177:9-10, Mar. 2, 2010). Shortly after maneuvering his vehicle into the driveway, Brenner argued with his neighbor about the vehicles blocking his driveway. Brenner admits that he was "loud" during that argument, and that he used "profanity." (Loughry Certif. Ex. C Plea Colloquy 11:15-17).

Later that day, Brenner decided to walk his dogs. However, before walking his dogs, Brenner pulled his vehicle out of his driveway and drove a short distance up the street to see whether the construction workers were still around his neighbor's property. During this trip, he noticed that Smith's car was "double parked for 20 minutes" in front of Parkin's house in a narrow passageway. (Brenner Dep. 183:9). After observing Smith's car, Brenner backed into his own driveway. Brenner claims that he did not "kick, strike or damage any car or any other property on Villa Avenue" on January 16, 2007. (Brenner Certif. ¶ 2).

While walking his dogs, Brenner noticed a vehicle following him. Brenner claims that he did not know that the vehicle was a police car. (Brenner Dep. 186:1-16, Mar. 2, 2010). Eventually, Brenner turned to see who was operating the vehicle. Brenner claims that when he turned to see who was operating the vehicle, he observed "a high-powered spotlight." (Brenner Dep. 187:10-11, Mar. 2, 2010). After observing the spotlight, Brenner turned around and continued walking his dog back to his house. Eventually, after handing the dog to his friend at the front door of the house, Brenner turned to respond to a voice that was calling him. Thereafter, Brenner claims that a police officer emerged from a patrol car and told him to place his hands on the hood of the patrol car and informed him that the officer was there to arrest him. At this point, Brenner claims that he did not say anything to the arresting officer. (Brenner Dep. 194:1-8, Mar. 2, 2010).

Brenner placed his hands on the hood of the patrol car as requested. Officer Pascal then

told Brenner to place his hands behind his back, and Brenner complied by placing one hand behind his back and leaving the other hand on the patrol car to maintain his balance. (Brenner Dep. 197:13-198:7, Mar. 2, 2010). When Brenner left one hand on the hood of the patrol car, Officer Pascal directed him to place both hands behind his back simultaneously. Brenner claims that he refused Officer Pascal's request because he could not comply with Officer Pascal's commands without falling headfirst into the patrol car. (Id.). Eventually, after forcing Brenner onto the hood of the car, the police officers kneed him in the side of the leg. (Brenner Dep. 202:10, Mar. 2, 2010). At some point after the officers kneed Brenner in the leg, an officer struck him in the ribcage. (Brenner Dep. 202:14-21, Mar. 2, 2010). Thereafter, the officers took Brenner to the ground. (Brenner Dep. 206:11-16, Mar. 2, 2010). Brenner claims that during the scuffle, he told the arresting officers that they broke his ribs. (Brenner Dep. 204:10, Mar. 2, 2010).

Brenner claims that after the officers arrested him he asked for immediate medical treatment. (Brenner Dep. 204:17-18, Mar. 2, 2010). Instead of taking Brenner to the hospital, however, the officers forced him into the patrol car, and took him to the police station for processing. After processing, the Moorestown ambulance squad took Brenner to the JFK Memorial Hospital in Cherry Hill, New Jersey. Twenty minutes elapsed between the time Plaintiff arrived at the police station and the time the police transported him to the JFK Memorial Hospital. (Moorestown Defs.' Br. in Supp. of Summ. J. Ex. S Police Report).

### C. Brenner's Guilty Plea

On June 26, 2007, Brenner appeared before Judge Phillip Iapalucci in the Moorestown Township Municipal Court. During a plea colloquy, Judge Iapalucci asked Brenner whether he "[was] basically a disorderly person by trying to prevent . . . being arrested . . . ." (Moorestown

Defs.' Br. in Supp. of Mot. for Summ. J. Ex. A Plea Colloquy, at 10:24 – 11:17).  Brenner's

attorney rephrased Judge Iapalucci's question by stating "what I think I discussed with Mr.

Brenner is that the facts will show that the police were there, there [sic] neighbors were around,

he was – he uttered some profanities, he was very loud and very boisterous . . . ." (Id.).  Brenner

responded, "Yes, at one point I was loud, yes.  And, used profanity.  At one point I was loud and

using profanity."  (Id.).  The Court accepted Brenner's plea of guilty to one charge of the

obstruction of the administration of law under N.J. Stat. Ann. § 2C:29-1(a), and imposed a fine

of $50.00.  (Moorestown Defs.' Br. in Supp. of Mot. for Summ. J. Ex. A Plea Colloquy, at 12:5-

8).

　　　　On January 15, 2009, Brenner filed the Complaint in this action.  On January 19, 2009,

Brenner filed an amended complaint.  The Amended Complaint alleges claims against the

individual police officers, the Moorestown police department, Parkin, Smith, and Korrot.

Specifically, the Amended Complaint alleges that:  (1) the Moorestown police officers denied

him equal protection by selectively enforcing laws against him and ignoring his complaints

regarding his neighbors' violations; (2) the Moorestown police officers arrested him without

probable cause in violation of the Fourth Amendment of the U.S. Constitution; (3) the

Moorestown police officers used excessive force while arresting him in violation of the Fourth

Amendment of the U.S. Constitution; (4) the Moorestown police officers deliberately delayed

providing him with medical care and treatment in violation of the Eighth Amendment of the U.S.

Constitution; (5) Chief Johnson and Lt. Mann, Sr. failed to adequately train and supervise the

officers under their command; and (6) all Defendants violated his constitutional rights under the

Ninth Amendment of the U.S. Constitution.  In addition, the Amended Complaint asserts a state

law tort claim against Smith, Korrot, and Parkin for malicious prosecution.  On October 1, 2010,

Smith moved for summary judgment, and on October 19, 2010, Korrot moved for summary judgment. On November 15, 2010, the Moorestown Defendants moved for summary judgment. The parties submitted their respective briefs and the motions are ripe for review.

## II.     STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Id.</u> at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. <u>Aman v. Cort Furniture Rental Corp.</u>, 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.

Once the moving party satisfies this initial burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushida Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear

the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" <u>Corliss v. Varner</u>, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting <u>Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.</u>, 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249.  Credibility determinations are the province of the factfinder, not the district court.  <u>BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

### A.  False Arrest

Plaintiff alleges that Officers Pascal and Mann, Jr. arrested him without probable cause. It is well-established that an arrest without probable cause is a Fourth Amendment violation actionable under § 1983.  <u>See</u> <u>Walmsley v. City of Phila.</u>, 872 F.2d 546, 551 (3d Cir. 1989) (citations omitted).  To state a Fourth Amendment claim for false arrest, a plaintiff must allege two elements:  (1) that there was an arrest; and (2) that the arrest was made without probable cause.  <u>Dowling v. City of Phila.</u>, 855 F.2d 136, 141 (3d Cir. 1988).  "Probable cause . . . requires more than mere suspicion; however, it does not require that the officer have evidence to prove guilt beyond a reasonable doubt."  <u>Orsatti v. New Jersey State Police</u>, 71 F.3d 480, 482-83 (3d Cir. 1995).  Rather, "[p]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."

Id. at 483.  Generally, the existence of probable cause is a factual issue.  Groman v. Twp. of

Manalapan, 47 F.3d 628, 635 (3d Cir. 1995) (citation omitted).

Defendants argue that Plaintiff's false arrest claim is barred because Plaintiff pled guilty

to a charge of obstructing justice in municipal court.  Plaintiff argues that his guilty plea in

municipal court does not bar his false arrest claim because he pled guilty to obstructing the

administration of law based upon events that occurred an hour prior to the arrival of Officers

Mann, Jr. and Pascal.  Because Plaintiff pled guilty to a charge of obstructing justice in

municipal court, and Officers Pascal and Mann, Jr. arrested him for that offense, Plaintiff's false

arrest claim fails as a matter of law.

### 1.  The Heck Bar

In Heck v. Humphrey, 512 U.S. 477 (1994), the Supreme Court held that a Section 1983

claim for damages premised on a civil rights violation is barred if the suit is inconsistent with or

would undermine the lawfulness of a state conviction or sentence.  The Supreme Court

explained:

> [I]n order to recover damages for allegedly unconstitutional
> conviction or imprisonment, or for other harm caused by actions
> whose unlawfulness would render a conviction or sentence invalid,
> a § 1983 plaintiff must prove that the conviction or sentence has
> been reversed on direct appeal, expunged by executive order,
> declared invalid by a state tribunal authorized to make such
> determination, or called into question by a federal court's issuance
> of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages
> bearing that relationship to a conviction or sentence that has not
> been invalidated is not cognizable under § 1983.

Id. at 486-87 (footnote omitted).  To determine whether a plaintiff states a claim under Section

1983, the Supreme Court instructed district courts to evaluate whether a favorable outcome in a

claim for damages under Section 1983 would necessarily imply the invalidity of the state court

judgment:

11

> Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

Id. at 487 (footnotes omitted).

Here, Officers Mann, Jr. and Pascal arrested Plaintiff for, among other things, obstructing the administration of law under N.J. Stat. Ann. § 2C:29-1(a).  Under N.J. Stat. Ann. 2C:29-1(a), a person is guilty of obstructing the administration of law if he "purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act."  In the municipal court proceeding, Plaintiff admitted that he uttered profanities, and was very loud and boisterous in the presence of police officers.  As a result of Plaintiff's guilty plea, the municipal court entered judgment against him for violating N.J. Stat. Ann. 2C:29-1(a).  Because Plaintiff pled guilty to obstructing the administration of law – the very same offense that Officers Mann, Jr. and Pascal arrested him for – a finding that the officers lacked probable cause would necessarily invalidate Plaintiff's guilty plea.  Therefore, Heck forecloses Plaintiff's false arrest claim.  See Burke v. Twp. Of Cheltenham, No. 10-1508, 2010 WL 3928524, at *6 (E.D. Pa. Oct. 05, 2010) (dismissing plaintiff's false arrest claim predicated on his arrest for disorderly conduct, when plaintiff pled guilty for disorderly conduct in state court proceeding).

**B. Excessive Force**

Where an Eighth Amendment excessive force claim "arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." Graham v. Connor, 490 U.S. 386, 394 (1989). In that context, the district court must determine "whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him." Smith v. Addy, 343 F. App'x 806, 808 (3d Cir. 2009). "The proper application of this inquiry 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers and others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Graham, 490 U.S. at 396). The district court may also consider other factors such as (1) the possibility that the suspect is violent, (2) the duration of the action, and (3) the possibility that the suspect may be armed. Id.

The Court finds that because there are material issues of fact regarding whether the officers used unreasonable force to subdue and arrest Plaintiff, summary judgment is inappropriate on Plaintiff's Fourth Amendment excessive force claim.

Both parties provide completely contradictory accounts of the events that transpired on January 16, 2007. Plaintiff claims that he did not flee from Officer Mann, Jr., and that he substantially complied with all of Officer Mann, Jr.'s commands. When asked to place his hands on the patrol car, Plaintiff claims that he complied without resistance. According to Plaintiff, the only time he refused to comply with an officer's request was when an officer told him to place both hands on the patrol car simultaneously. Plaintiff claims that he disobeyed the officer's

request by placing only one hand on the patrol car to avoid falling head-first into the car.  By contrast, Defendants claim that Plaintiff attempted to flee from arrest, and then physically resisted arrest.  According to Defendants, when Officer Mann, Jr. approached Plaintiff in the patrol car, Plaintiff simply ignored him and continued to walk toward his residence.  After Officer Mann, Jr. arrived at Plaintiff's residence, Plaintiff told the officers to "get off his f-ing lawn/property" and stated that he "didn't do anything f-ing wrong."  (Pascal Dep. 66:20-25; 67:1-5, Mar. 22, 2010).  Defendants also claim that when the officers attempted to place handcuffs on Plaintiff he resisted, thereby prompting the officers to employ both the "wrist lock" and "straight arm bar" techniques to subdue him.

In order for the Court to determine whether the force Officers Mann, Jr. and Pascal employed to arrest Plaintiff was "objectively reasonable" the Court must evaluate the credibility of the testimony provided by both parties.  However, at this stage of the litigation, it is not the proper role of the Court to choose whether to believe the officers or Plaintiff.  As previously mentioned, on a motion for summary judgment, the district court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Therefore, because it is unclear whether the amount of force the police officers used to subdue Plaintiff was objectively reasonable, the Court denies Defendants' motion for summary judgment on Plaintiff's excessive force claim.

### C.  Claims against Officer Maahs

A police officer "has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior."  Smith v. Mensiger, 293 F.3d 641, 650 (3d Cir. 2002).  Thus, "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating

takes place in his presence, the officer is directly liable under Section 1983." Id. (quoting Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986)).  "However, an officer is only liable if there is a realistic and reasonable opportunity to intervene." Id.  Therefore, "if [Plaintiff] can show at trial that an officer attacked him while [Officer Maahs] ignored a realistic opportunity to intervene, he can recover" damages.  Id. (quoting Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000)).

Here, summary judgment is inappropriate on Plaintiff's failure-to-intervene claim because a reasonable jury could find that:  (1) Officers Mann, Jr. and Pascal used excessive force when they arrested Plaintiff, and (2) Officer Maahs had a realistic and reasonable opportunity to intervene but failed to take action.  During a deposition, Officer Maahs testified that when he arrived at Plaintiff's house, he observed Officers Mann, Jr. and Pascal "getting ready to take [Plaintiff] down onto the ground and handcuff h8m [sic]." (Maahs Dep. 15:21-23, Apr. 13, 2010).  Officer Maahs also testified that he was close enough to touch Officer Mann, Jr. and Officer Pascal when they were preparing to take Plaintiff to the ground. (Id. at 16:7-11).  Those facts alone demonstrate that, at the very least, there is a material issue of fact regarding whether Officer Maahs had a realistic and reasonable opportunity to intervene to prevent the unlawful use of force against Plaintiff.  See Baker v. Monroe Twp., 50 F.3d 1186 (3d Cir. 1995) (denying officer's motion for summary judgment where plaintiff presented evidence that officer "knew of and acquiesced" to allegedly unlawful treatment of plaintiff).  Based on Officer Maahs's physical presence at the scene of the arrest and the fact that he observed Officers Mann, Jr. and Pascal preparing to take Plaintiff to the ground, a reasonable jury could conclude that Officer Maahs had a realistic and reasonable opportunity to intervene to prevent the unconstitutional use of force against Plaintiff.  Accordingly, Defendants' motion for summary judgment on Plaintiff's failure-to-intervene claim is denied.

### D.  Failure to Train

It is well-settled that Section 1983 does not create a cause of action against a municipality based solely on a theory of respondeat superior.  Monell v. Dept. of Soc. Servs., 436 U.S. 658, 691 (1978).  To hold a government entity liable for the conduct of its officials under Section 1983, the Court must find that policymakers "either deliberately chose not to provide officers with training or acquiesced to a longstanding practice or custom of providing no training . . . ." Id.  Consequently, "a municipality may incur liability under § 1983 only when its policy or custom causes a particular constitutional violation."  Marable v. West Pottsgrove Twp., 176 F. App'x 275, 282-83 (3d Cir. 2006).

In order to succeed on a failure-to-train claim, the plaintiff must prove that the existing custom or practice created an unreasonable risk of harm and that officials knew of and disregarded the risk.  Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1999).  The plaintiff must identify specific training or policies that would prevent the harm and show that "the risk reduction . . . is so great and so obvious that failure of those responsible for the content of the training to provide [the plaintiff's proposed training] can reasonably be attributed to a deliberate indifference . . . ."  Woloszyn v. Cnty. of Lawrence, 396 F.3d 314, 325 (3d Cir. 2005) (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 1029-30 (3d Cir. 1991)).  "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality – a 'policy' as defined by our prior cases – can a city be liable for such a failure under § 1983."  Simmons, 947 F.2d at 1060.  Thus, "in order to meet the deliberate indifference standard for directly subjecting a municipality to section 1983 liability, [the plaintiff] must present scienter-like evidence of indifference on the part of a particular policymaker or policymakers."  Id. at 1060-61.

Finally, a municipality's deliberate indifference failure to train is not established by:  "(1)

presenting evidence of the shortcomings of an individual; (2) proving that an otherwise sound training program occasionally was negligently administered; or (3) showing, without more, that better training would have enabled an officer to avoid the injury-causing conduct." Simmons v. City of Phila., 947 F.2d 1042, 1060 (3d Cir. 1991).

The Court finds that Plaintiff's failure-to-train claim fails because Defendants offered ample evidence that the officers in Moorestown received sufficient training to perform their duties, and Plaintiff fails to offer evidence that Chief Johnson and Officer Mann, Sr. deliberately chose not to provide their officers with additional training on how to respond to neighborhood disputes, or otherwise acquiesced to a longstanding practice of providing inadequate training in that area.

In New Jersey, the Office of the Attorney General creates mandatory guidelines for all police departments in the State of New Jersey. (Williams Expert Report, at 5). Within the Office of the Attorney General, the Division of Criminal Justice Police Training Commission establishes the guidelines for police training and operations in the basic training course for police officers. All police officers must receive training and certification under the New Jersey Attorney General Guidelines. That training includes successful graduation from one of New Jersey's Police Training Academies. (Id.). The record demonstrates that all of the police officers named in this lawsuit received sufficient training under the guidelines proscribed by the New Jersey Attorney General and the New Jersey Police Training Commission. (Williams Dep. 32:1-5, Sept. 16, 2010).

In addition, all Moorestown police officers receive mandatory in-service training from the Burlington County Prosecutor. Those training sessions consisted of watching PowerPoint presentations on the use of force and other topics, and completing a written test. (Johnson Dep.

16:14-19, May 20, 2010). Plaintiff's expert, Mr. Williams, testified that the police chief has the

discretion to choose the topics to train during the mandatory in-service training. (Williams Dep.

22:3-7, Sept. 16, 2010). Mr. Williams also testified that the Attorney General's office does not

require mandatory in-service training on all of the topics listed in the training guidelines

provided by the Attorney General. (Williams Dep. 22:8-11, Sept. 16, 2010). Thus, a police

chief has the discretion to include certain topics and exclude others based upon the needs of the

police officers in his precinct. (Id.).

      Because all of the police officers named in this litigation are graduates of a New Jersey

Police Academy and received the in-service training administered by the Burlington County

Prosecutor's office, there is no question that they received at least the minimum level of training

necessary to perform their duties. Thus, in order for Plaintiff to succeed on his deliberate

indifference failure-to-train claim, he must put forth evidence that Chief Johnson and Lt. Mann,

Sr. knew of and consciously disregarded the risk that by failing to include additional conflict

resolution and crisis intervention training in the curriculum for mandatory in-service training,

they exposed the citizens of Moorestown to the unreasonable use of force by Moorestown police

officers. Woloszyn, 396 F.3d at 325.

      Based on the evidence before the Court, no reasonable jury could conclude that Chief

Johnson and Officer Mann, Sr. failed to adequately train the officers named in this dispute.

Plaintiff points to no evidence that Chief Johnson knew that his officers needed additional

training in conflict resolution in order to prevent the kind of harm alleged in this lawsuit. There

is no evidence that Moorestown citizens frequently complained that Moorestown police officers

made arrests without probable cause or used excessive force to detain otherwise compliant

arrestees. Moreover, there is no evidence that Officers Mann, Jr., Pascal, or Maahs previously

received any punishment for using excessive force to quell a neighborhood crisis or to subdue a noncompliant suspect.  Thus, Plaintiff cannot argue that Chief Johnson and Lt. Mann, Sr. consciously ignored the need for additional training.

Plaintiff's argument that better training would have prevented the harm at issue in this dispute fails as a matter of law.  (See Pl.'s Br. in Opp'n to Moorestown Defs.' Mot. for Summ. J. at 43) ("The record in this case shows that Johnson and Lt. Mann and the Department generally have a policy, practice and custom of training by use of DVD videos, that do not reach the area of concern reflected in the police custom in this case.").  In Simmons, the Third Circuit held that a plaintiff cannot succeed on a deliberate indifference failure-to-train claim by "showing, without more, that better training would have enabled an officer to avoid the injury-causing conflict." 947 F.2d at 1060.  Thus, Plaintiff's contention that better training would prevent the events that gave rise to this dispute is unavailing.

Finally, Plaintiff's argument that Chief Johnson did not watch the mandatory in-service training DVD's is not legally relevant to Plaintiff's deliberate indifference failure-to-train claim. Whether Chief Johnson watched the in-service training DVD's is perhaps relevant to whether he was trained to respond to a neighborhood crises, but bears no weight on the issue of whether he properly trained the men and women under his command.  Moreover, even if Chief Johnson was negligent by failing to watch the in-service training DVDs, Plaintiff's claim fails because only deliberate indifference gives rise to a claim for failure-to-train under the Fourth Amendment, not mere negligence.  See Regan v. Upper Darby Twp., 363 F. App'x 917, 923 (3d Cir. 2010) (noting that a plaintiff must show "something more culpable . . . than a negligent failure to recognize [a] high risk of harm" in order to succeed on a deliberate indifference claim) (internal quotations omitted).

Therefore, because Defendants offer evidence that Chief Johnson and Lt. Mann, Sr. complied with the training requirements issued by the New Jersey Attorney General and the New Jersey Police Training Commission, and Plaintiff fails to offer evidence that Chief Johnson and Lt. Mann, Sr. deliberately failed to adequately train or supervise the officers under their command, Defendants are entitled to summary judgment on Plaintiff's failure-to-train claim.

### E.  Failure to Provide Adequate Medical Care

Defendants argue that Plaintiff's failure to provide adequate medical care claim fails because (1) "[t]he Complaint fails to give any indication as to the nature of the Plaintiff's injuries, or whether he informed the police that he needed medical attention"; and (2) "Plaintiff admit[ed] that he was taken to Kennedy Memorial Hospital by ambulance on the night of the incident, only twenty (20) minutes after he was brought to the station."  (Defs.' Br. at 27) (citing Brenner Dep. 224:6-10, Mar. 2, 2010; Defs. Br. Ex. S, Police Report).  Plaintiff fails to respond to Defendants' arguments or otherwise offer any evidence in support of his deliberate indifference claim.

The Court finds that because Plaintiff failed to respond to Defendants' contention that the Moorestown police did not delay providing Plaintiff with access to medical treatment during or after his arrest, Plaintiff's deliberate indifference claim fails.  The general rule is that "[w]here a plaintiff has brought a cause of action which is challenged through a motion for summary judgment as legally insufficient, it is incumbent upon the plaintiff to affirmatively respond to the merits of a summary judgment motion."  Skirpan v. Pinnacle Health Hosps., No. 07-1703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010); see Player v. Motiva Enters., LLC, 240 F. App'x 513, 522 n.4 (3d Cir. 2004) (stating that when a party moving for summary judgment satisfies its initial burden of proving that there is an absence of evidence to support the nonmoving party's

case, and the nonmoving party fails to respond, "the nonmoving party cannot later argue, on appeal, that there is evidence in the record that creates a genuine issue of material fact, if that evidence was not pointed out to the district court at the time of the motion for summary judgment.") (internal quotations omitted).  Thus, "a Plaintiff's failure to respond to [the defendant's arguments on summary judgment] constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues." Skirpan, 2010 WL 3632536, at *6; Seals v. City of Lancaster, 553 F. Supp. 2d 427, 433 (E.D. Pa. Mar. 21, 2008) (finding that because plaintiff failed to address portion of defendant's motion for summary judgment in her response, "plaintiff's failure . . . constitute[d] abandonment of those claims.").  Here, Defendant produced evidence that the Moorestown police department provided Plaintiff with adequate medical care within a reasonable amount of time, and Plaintiff failed to refute that evidence.  Plaintiff's failure to respond to Defendants' evidence constitutes abandonment of his deliberate indifference failure to provide adequate medical treatment claim.  Accordingly, Plaintiff's deliberate indifference failure to provide adequate medical treatment claim is dismissed.

### F.  Claims Against John Does 1-10

Defendants argue that the Court should dismiss Plaintiff's claims against John Does 1-10 because, after two years of discovery, Plaintiff cannot identify any of the unnamed defendants in this litigation.  (Moorestown Defs.' Br. in Supp. of Mot. for Summ. J., at 35).  Plaintiff fails to identify any of the unnamed defendants, or otherwise offer evidence in support of his claims against the unnamed defendants in this litigation.

The Court finds that because after three years of discovery, Plaintiff fails to identify any defendants in this litigation other than Chief Johnson, Lt. Mann, Sr., Officers Mann., Jr., Pascal and Maahs, and Parkin, Smith and Korrot, Plaintiff's claims against John Does 1-10 are

dismissed.  First, as previously mentioned, in order to survive a motion for summary judgment, a plaintiff must offer evidence that there is a genuine issue of material fact for trial.  Corliss, 247 F. App'x at 354.  Here, Plaintiff failed to offer any evidence that a municipal officer, other than the officers named in this litigation, is liable for the events that transpired on January 16, 2007.  That fact alone warrants dismissal of any claims against the unnamed Defendants.  Moreover, even if the record contained evidence supporting liability against the so-called "John Does 1-10," because Plaintiff failed to respond to Defendants' argument that the Court should dismiss the claims against John Does 1-10, Plaintiff forfeited the right to contest those claims throughout the remainder of this litigation.  See Skirpan, 2010 WL 3632536, at *6.  Therefore, Plaintiff's claims against all unnamed Defendants in this case are dismissed.

### G.  Qualified Immunity

Defendants argue that Officers Pascal and Mann, Jr. are entitled to qualified immunity. Specifically, Defendants contend that the officers had probable cause to arrest Plaintiff, and used reasonable force to conduct that arrest.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The Third Circuit Court of Appeals uses a two-step inquiry to determine whether a government official is entitled to qualified immunity in connection with the arrest of a private citizen.  Pollock v. The City of Phila., No. 10-2041, 2010 WL 5078003, at *4 (3d Cir. Dec. 14, 2010) (citing Pearson v. Callahan, 555 U.S. 223 (2009)).  First, a court must "decide whether the facts . . . shown . . . make out a violation of a constitutional right."  Id. (quoting Pearson, 555 U.S. at 815-16).

Second, the court must "decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct."  Id. (quoting Pearson, 555 U.S. at 816) (internal quotation marks omitted).  "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  Id. (quoting Pearson, 555 U.S. at 816) (internal quotation marks omitted).  Qualified immunity is an affirmative defense and the burden of pleading it rests with the defendant.  Gomez v. Toledo, 446 U.S. 635, 639 (1980).

With respect to the second step in the qualified immunity analysis, the court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier v. Katz, 533 U.S. 194, 2002 (2001).  "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness [in this context] is judged against the backdrop of the law at the time of the conduct."  Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

Because there are material issues of fact concerning Plaintiff's actions prior to and during his arrest, the Court cannot enter summary judgment as to whether Officers Mann, Jr. and Pascal are entitled to qualified immunity.  As previously mentioned, Plaintiff and Defendants offer conflicting accounts of the events that transpired on January 16, 2007.  Plaintiff claims that although he complied with all of Officer Mann, Jr.'s requests, Defendants used excessive force to arrest him.  Defendants tell an entirely different story, arguing that Plaintiff attempted to evade Officer Mann, Jr., and then resisted arrest when Officers Mann, Jr. and Pascal attempted to arrest him.  Because it is unclear at this juncture whether Plaintiff resisted arrest and whether Defendants used a reasonable amount of force to arrest Plaintiff, the Court cannot determine whether Defendants' actions were lawful.  Accordingly, the Court will deny Defendants' request

for summary judgment on the issue of qualified immunity.

**H.  Class-of-One Discrimination Claim**

Plaintiff alleges that the police officers discriminated against him in violation of the Equal Protection Clause of the Fourteenth Amendment.  The Fourteenth Amendment provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV § 1.  Under the "class-of-one" theory, a plaintiff who alleges that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment" may recover in a Section 1983 action.  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  Thus, to succeed on a claim under the equal protection class-of-one theory, a plaintiff must prove that:  "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment."  Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006).  A class-of-one claim fails when "there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  Heller v. Doe, 509 U.S. 312, 320 (1993) (emphasis added).

Defendants argue that summary judgment is appropriate on Plaintiff's class-of-one equal protection claim because:  (1) the record demonstrates that the Moorestown police frequently responded to Plaintiff's complaints against his neighbors; (2) Plaintiff offered no evidence that the Township intentionally treated him differently than other similarly situated neighbors; and (3) Plaintiff offers no evidence that the Moorestown police officers were biased against him in favor of his neighbors.  Plaintiff argues that summary judgment is inappropriate because (1) when Officer Mann, Jr. responded to the citizen complaints on January 16, 2007, he immediately assumed that Plaintiff was the cause of the dispute; (2) Officer Mann, Jr. "turned a deaf ear to

[Plaintiff's] complaints about Korrot, because Korrot was a long time resident"; and (3) when Officer Mann, Jr. arrived on the scene on January 16, 2007, he remarked that Plaintiff needed medication.

The Court finds that Plaintiff's class-of-one claim fails because there is no evidence that the Moorestown police officers treated him differently than other similarly situated residents of Villa Avenue.  First, there is no factual basis for Plaintiff's contention that the Moorestown police did not respond to his frequent complaints about Korrot's conduct.  In fact, the evidence is contrary.  The record demonstrates that the Moorestown police department responded to at least ten of Plaintiff's complaints about Korrot during a twenty-three month period.  (See Pl.'s Br. Ex. L Nos. 9-14, 31-34, 41-42, 45-46, 49-52, 54-55).

Second, the evidence demonstrates that the Moorestown police officers had a rational basis for arresting Plaintiff.  As previously mentioned, in the municipal court proceeding, Plaintiff pled guilty to a charge of obstructing the administration of law under N.J. Stat. Ann. 2C:29-1(a).  During the plea colloquy, Plaintiff admitted to being "loud" and "boisterous" in the presence of uniformed officers.  That admission alone provides, at the very least, a conceivable basis for Officer Mann, Jr.'s belief that Plaintiff was the cause of the disturbance at Villa Avenue.  Heller, 509 U.S. at 320.   Moreover, Officer Mann, Jr. drove to Villa Avenue in order to respond to two complaints that Plaintiff was harassing other residents of Villa Avenue.  Both Smith and Parkin reported to the Moorestown police that Plaintiff harassed them and kicked a vehicle in the street.  Based on those complaints and Officer Mann, Jr.'s observations at the scene of the arrest, Officer Mann, Jr. certainly had a reasonably conceivable basis for his belief that Plaintiff caused the disturbance on Villa Avenue, and perhaps even his belief that Plaintiff was mentally ill.

Therefore, because Plaintiff fails to put forth evidence that the Moorestown police intentionally treated him differently than other similarly situated residents of Villa Avenue, the Court will grant Defendants summary judgment on Plaintiff's class-of-one claim.

## I. Ninth Amendment

Plaintiff alleges that Defendants violated his rights under the Ninth Amendment of the U.S. Constitution.  However, "the Ninth Amendment does not independently provide a source of individual constitutional rights."  Perry v. Lackawanna Cnty Children & Youth Servs., 345 F. App'x 723, 726 (3d Cir. 2009); see Jenkins v. C.I.R., 483 F.3d 90, 92 (2d Cir. 2007) ("The Ninth Amendment is not an independent source of individual rights; rather, it provides a 'rule of construction' that we apply in certain cases.").[5]  Because Plaintiff offers no independent basis for his Ninth Amendment claim, the Court will grant Defendants summary judgment on Plaintiff's Ninth Amendment claim.

## J. Plaintiff's Claims Against Defendants Smith and Korrot

### 1. Defendant Smith

Defendant Smith moves for summary judgment on Plaintiff's malicious prosecution claim.  Smith argues that Plaintiff's malicious prosecution claim fails because:  (1) "simply summoning the police to report unwelcome or suspicious activity is not tantamount to the initiation of a criminal proceeding," and (2) because Plaintiff pled guilty to the disorderly persons offense under New Jersey law in state court, Plaintiff cannot prove a favorable

---

[5] The Court also notes that Plaintiff failed to respond to Defendants' argument that the Ninth Amendment does not independently provide a source of constitutional rights.  This failure alone warrants dismissal of Plaintiff's Ninth Amendment claim.  See Skirpan, 2010 WL 3632536, at *6 ("[A] Plaintiff's failure to respond to [the defendant's arguments on summary judgment] constitutes an abandonment of these causes of action and essentially acts as a waiver of [those] issues.").

termination.[6]  Plaintiff argues that summary judgment is inappropriate because:  (1) under New

Jersey law, reporting conduct to a police officer may constitute the  "initiation of a criminal

proceeding," and (2) because the municipal court dismissed some of the charges against him,

there is evidence that some of the charges against Plaintiff were terminated in his favor.  (Pl.'s

Br. at 8).

     Under New Jersey law, the elements of a malicious prosecution claim arising out of a

criminal prosecution are:  (1) the criminal action was instituted by the defendant against the

plaintiff, (2) it was actuated by malice, (3) there was an absence of probable cause for the

proceeding, and (4) the criminal proceeding was terminated favorably to the plaintiff.

Cantrambone v. Sydnor, No. 07-1345, 2007 WL 1652295, at *2 (D.N.J. May 29, 2007) (citing

Lind v. Schmid, 67 N.J. 255, 262 (1975)).  A plaintiff must prove each of those elements in order

to succeed on a malicious prosecution claim.  Lind, 337 A.2d at 368.

     In order to prove the first element of a malicious prosecution claim, the plaintiff need not

prove that the defendant actually signed a complaint in a state court action.  Epperson v. Wal-

Mart Stores, Inc., 862 A.2d 1156, 1161 (N.J. Super. Ct. App. Div. 2004) (holding that "the mere

fact that [defendant] did not sign the complaint . . . is not alone determinative" of whether

plaintiff satisfies the first element of a malicious prosecution claim).  Instead, a plaintiff may

satisfy the first element of a malicious prosecution claim by offering evidence that the defendant

"took 'some active part in instigating or encouraging the prosecution' or 'advis[ing] or

assist[ing] another person to begin the proceeding, [or] ratifying it when it is begun in [the]

---

[6] Smith also moves for summary judgment on Plaintiff's false arrest claim.  However, Plaintiff does not assert a
claim against Smith for false arrest or false imprisonment.  The Amended Complaint alleges that Smith "maliciously
made or caused to be made a meritless, factually unwarranted report to police against Plaintiff that summoned the
police of Villa Avenue to take action against Plaintiff."  (Am. Compl. ¶ 53).  Because it appears that Plaintiff does
not allege that Smith falsely imprisoned him on January 16, 2007, the Court will not address Smith's contentions on
that issue.

defendant's behalf, or tak[ing] any active part in directing or aiding the conduct of the case.'" Id. (quoting Prosser and Keeton, The Law of Torts § 119 at 872 (5th ed., 1984)).

In Epperson, an employee of Wal-Mart Stores, Inc. ("Wal-Mart") assisted police officers with the investigation of the illegal sale of stolen property in a Wal-Mart parking lot. After working for Wal-Mart for approximately ten years, the employee received a tip that a Wal-Mart store manager's ex-husband was selling stolen property in the Wal-Mart parking lot. Epperson, 862 A.2d at 1159. The employee gave a written report of the illegal sales to her supervisor and a local police officer. Id. Thereafter, the employee asked the Wal-Mart store manager's ex-husband where she could find a stereo, and the manager's ex-husband provided the employee with a stereo within three days of the employee's request. Id. After consummating the transaction with the manager's ex-husband, the employee informed both the police and her manager of her purchase. Id. Later, the police officer asked the employee to make another purchase from the manager's ex-husband. Id. Subsequently, the Wal-Mart district manager of loss prevention asked the employee to accompany him to the police station. Id. At the police station, the police officer asked the employee to sign a Miranda form, and another officer interrogated the employee, "insinuating that she had stolen stereos from Wal-Mart." Id. at 1160. The police officer and the district manager of loss prevention accused the employee of lying. Id. The district manager of loss prevention also encouraged the employee to confess to committing the crime. Id. When the police released the employee, the district manager of loss prevention terminated her employment, removed her key, badge, and discount card, and the police arrested her for shoplifting. Id.

Later the employee brought claims against the Township and Wal-Mart for malicious prosecution. Id. The trial court dismissed the employee's malicious prosecution claim. Id. The

appeals court reversed, holding that "the mere fact that Wal-Mart did not sign the complaint . . . is not alone determinative" on the first element of a malicious prosecution claim.  Id. at 1161. The court concluded that "the jury could have inferred from the evidence offered by [the] employee that by bringing [the employee] to the police station, . . . remaining present while [the employee] was interrogated by the police, and by actually participating in the interrogation, Wal-Mart encouraged, participated in, and perhaps even pressured the Franklin Township police to prosecute [the employee]."  Id. at 1161.  The court held that a jury could infer that "Wal-Mart was the 'proximate and efficient cause of maliciously putting the law in motion.'"  Id. (quoting Seidel v. Greenberg, 260 A.2d 863, 869 (N.J. Super. Ct. Law Div. 1969)).

Here, the Court finds that because Smith did not institute a criminal proceeding by calling 9-1-1 to report Plaintiff's behavior, Smith is entitled to summary judgment on Plaintiff's malicious prosecution claim.  First, unlike the defendants in Epperson, who substantially assisted the police investigation of the plaintiff's conduct, here, the extent of Smith's involvement in Plaintiff's prosecution was relatively inconsequential.  In Epperson, the defendants provided substantial, meaningful assistance to the police officers by transporting the plaintiff to the police station, remaining present while the police interrogated the plaintiff, participating in that interrogation, and encouraging the police to prosecute the plaintiff.  Here, the extent of Smith's involvement in Plaintiff's prosecution was a mere 9-1-1 phone call.  There is no evidence that Smith interrogated Plaintiff, encouraged the police to interrogate Plaintiff, or provided the police with any other assistance with Plaintiff's prosecution aside from their initial report.  Thus, Epperson is distinguishable from this lawsuit.

Second, Plaintiff's argument that a party can initiate a criminal proceeding by simply making a 9-1-1 call is unpersuasive.  Plaintiff offers Epperson and Seidel for the proposition that

"a person who, out of malicious motive, takes action or makes a report that is the 'efficient and proximate cause' of maliciously 'putting the law in motion' against another, qualifies as an initiator of criminal proceedings."  (Pl.'s Br. in Opp'n to Def. Smith's Mot. for Summ. J., at 7) (quoting Epperson, 862 A.2d at 1161; Seidel, 260 A.2d at 869).  However, Seidel squarely rejects the proposition that a plaintiff initiates a criminal proceeding by merely reporting suspected unlawful conduct to a prosecuting officer.  In Seidel, the court stated that:  "[t]he test of liability in an action for malicious prosecution is:  Was defendant actively instrumental in putting the law in force?"  260 A.2d at 869.  However, the court further noted that a plaintiff does not prove that the defendant initiated a criminal proceeding when "the prosecution of [the] plaintiff was brought about by the intervening and independent acts of law enforcement authorities who filed the complaint against him after making their own investigation and appraisal . . . ."  Id. at 873 (citing Magowan v. Rickey, 45 A. 804 (N.J. 1900); MacLaughlin v. Lehigh Valley R. Co., 108 A. 309 (N.J. 1919); Prostick v. Vroom, 29 A.2d 857 (N.J. 1942)).  The court explained that "[t]he rationale of these cases is that if a citizen comes forth and tells a prosecuting officer truthfully what he knows and the prosecuting officer files a complaint, defendant is not liable for malicious prosecution."  Id.  Therefore, because Smith did not initiate a criminal proceeding against Plaintiff by calling 9-1-1 on January 16, 2007, Plaintiff's malicious prosecution claim fails as a matter of law.

Moreover, even assuming arguendo that Plaintiff could initiate a criminal proceeding by simply making a 9-1-1 call, Plaintiff's malicious prosecution claim fails because Plaintiff cannot demonstrate that the Officers Mann Jr. and Pascal lacked probable cause to arrest him.  As previously noted in this Opinion, Heck bars Plaintiff from claiming that Officers Mann Jr. and Pascal lacked probable cause to arrest him on January 16, 2007.  Therefore, because Officers

Mann Jr. and Pascal had probable cause to arrest Plaintiff, Plaintiff cannot prove the third element of a malicious prosecution claim.  For this reason alone, the Court must grant Defendants summary judgment on Plaintiff's malicious claim.  Lind, 337 A.2d at 368 ("Upon failure to prove any [of the elements of a malicious prosecution claim], the cause must fail.").

### 2.  Defendant Korrot

Defendant Korrot argues that because he was not present during any of the events that gave rise to this litigation, the Court should grant him summary judgment on all of Plaintiff's claims against him.  Plaintiff did not respond to Korrot's motion for summary judgment.

Because the record lacks any evidence that Korrot was present during any of the events that transpired on January 16, 2007, and because Plaintiff failed to object to Korrot's motion for summary judgment or otherwise respond to Korrot's arguments, the Court will grant Korrot summary judgment on all claims against him.  As previously mentioned, on a motion for summary judgment, after the movant satisfies his burden of demonstrating that there is no issue of material fact for trial, the plaintiff must "identify those facts of record which would contradict the facts identified by the movant."  Corliss, 247 F. App'x at 354 (internal quotation marks omitted).  Here, Plaintiff offers no evidence that Korrot was present during the events that gave rise to this litigation.  For this reason alone, the Court may grant Korrot summary judgment.

Moreover, even if the record contains evidence that Korrot was involved in the events that transpired on Villa Avenue on January 16, 2007, because Plaintiff failed to respond to Korrot's motion for summary judgment, Plaintiff abandoned all claims against Korrot.  The general rule is that "a [p]laintiff's failure to respond to [the defendant's arguments on summary judgment] constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues."  Skirpan, 2010 WL 3632536, at *6.  Here, Plaintiff failed to respond to Korrot's

31

contention that the Court should dismiss all claims against him because he was "was not present or had no involvement with the Plaintiffs [sic] arrest."  (Notice of Mot. for Summ. J. filed by Def. Korrot, at 2).  Therefore, all claims against Korrot are dismissed.

## IV.     CONCLUSION

For the reasons discussed above, the Moorestown Defendants' motion for summary judgment on Plaintiff's excessive force claim is **DENIED**.  The Moorestown Defendants' motion for summary judgment is **GRANTED** with respect to Plaintiff's false arrest, deliberate indifference failure to provide adequate medical treatment, deliberate indifference failure to train, equal protection class-of-one, and Ninth Amendment claims.  Finally, the Court will **GRANT** the motions for summary judgment filed by Defendants Korrot and Smith with respect to Plaintiff's malicious prosecution claim.  An appropriate order shall issue today.


Date:__5/17/2011_____                         _/s/ Robert B. Kugler___
                                                        ROBERT B. KUGLER
                                                        United States District Judge